JANUARY TERM, 1884, No. 27.                    MARCH 28, 1884.

## Wilson's Appeal.

1. Where an administrator makes a sale in good faith of his decedent's business interests, in fulfillment of an arrangement made by the intestate in his lifetime, taking therefor the purchasers' bond for the payment of the purchase money, and this afterwards proves in greater part uncollectible, the administrator cannot be held personally liable if it appears that he has exercised a just and wise discretion, and has realized as much for the estate as could have been done by any course he might have pursued.

2. The participation by the distributee when of age, in the distribu-

tion of the portion of the sum paid on account of the bond, is a ratification of the sale by him, and operates. as an estoppel to prevent his subsequent impeachment of its wisdom.

Before MERCUR, C. J.; GORDON,. PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Appeal of William Devoo Wilson from a decree of the Orphans' Court of *Philadelphia County* upon the final account of Elwood Johnson, administrator of the estate of Franklin S. Wilson, deceased.

The facts fully appear in the following adjudication of the auditing judge, PENROSE:

"The decedent died September 12, 1871, intestate, leaving a widow, Mrs. Agnes Wilson, and a son, William Devoo Wilson, then a minor, who has since, viz: June 20, 1878, become of age.

Under a former account, as appears by the adjudication filed May 14, 1879, distribution to the amount of $97,-187 48 was made, viz: to the widow, one third, $32,395-83, and to the guardian of the son and to the son himself, or his attorney in fact, two thirds, $64,791 65.

The present account shows a balance in the hands of the accountant, composed as there stated, of . . $6,436 35 which sum, composed as aforesaid—

| | | |
|---|---|---|
| less clerk's fees, . . . . . . . . . . . | $18 50 | |
| and fees to Messrs. Dickson and Dale, | . 200 00 | |
| | | 218 50 |

viz :, . . . . . . . . . . . . . . . . . . . . $6,217 85
subject to payments heretofore made on account (viz : To Mrs. Wilson, $2,070, and to W. Devoo Wilson, $973 98) is awarded to Mrs. Agnes Wilson, widow of decedent, and to W. Devoo Wilson, son of decedent, in the proportions to which they are respectively entitled under the provisions of the intestate laws.

Credit is claimed in the account for $15,391 52—"balance on first account uncollectible." The credit thus claimed is for the balance of the appraised value of a bond and warrant of attorney given to the accountant December 1, 1871, by J. Milton Raab, Seth Thomas, and William M. Purnell, the purchasers of the interest of the decedent in the firm of Rockhill & Wilson.

The credit was excepted to on the ground,. *First*, that the transaction was one which the accountant was not authorized to enter into ; and, *Second*, that the loss arose from his failure to enforce payment from the debtors in accordance with the terms of the instrument.

[Wilson's Appeal.]

The firm of Rockhill & Wilson, clothiers, was composed of the decedent and Daniel H. Rockhill, his wife's father. Their business, which was principally that of the manufacture and sale of ready-made clothing, 603 and 605 Chestnut street, Philadelphia, had been carried on for many years. During the Rebellion, they made large profits upon clothing contracts, and until the fall of 1867, they were able, with the capital which they had at their command, to make their purchases for cash or upon thirty days' credit. About the time last mentioned, the printing and publishing house of H. G. Leisenring failed, owing them $220,000, of which they afterwards recovered a dividend of but 37½ per cent. In consequence of their loss, they were no longer able to do a cash business, but were always afterwards compelled to give notes and to borrow large sums of money, pledging their private securities and property as collateral.

In June, 1871, Mr. Wilson determined to withdraw from the firm and take an interest in the printing house formerly carried on by H. G. Leisenring. With this object in view, and with the consent of his partner, Mr. Rockhill, he offered his interest at the value as shown by the books of the firm, after taking an account of stock, to J. Milton Raab, Seth Thomas, and William M. Purnell. These gentlemen, he was aware, were entirely without means, but they had been in the employ of the house for many years as salesmen, &c., &c., and possessed his entire confidence as men of integrity and business capacity; and he was willing to accept the risk of their inability to pay from their future earnings. His offer was accepted, and on the 1st of July, 1871, an account of stock having been taken, his share of the net assets appeared to be $27,022 02.

A delay in the execution of the contract was occasioned by a suggestion of his counsel, Mr. Bullitt, with regard to the liability for future debts which he would incur if the name of Rockhill & Wilson should continue to be used after his retirement from the firm, and by his subsequent absence from the city during the summer vacation. He returned on Saturday, September 9, 1871; was in his office on Monday, the 11th, and died very suddenly and unexpectedly at three o'clock on the following morning.

Letters of administration were granted to the accountant and Mrs. Agnes Wilson; and on the 1st December, 1871, with the approval of Mrs. Wilson and the advice of Mr. Rockhill and of Mr. Bullitt, Mr. Wilson's counsel, and in performance of the contract made in the lifetime of the decedent, he sold to Messrs. Raab, Thomas, and

Purnell the interest of the estate in the firm of Rockhill & Wilson for the price agreed upon—$27,022 02—the purchasers giving their bond with warrant of attorney for that sum, payable in yearly instalments of not less than $5,000 per annum, until the whole should be fully paid off—with interest at six per cent.; with the proviso that 'if at any time default shall be made in the payment of interest for the space of thirty days after the same shall fall due, then and in such case the whole principal debt aforesaid shall, at the option of the said Ellwood Johnson, administrator aforesaid,' &c., 'become due and payable immediately, and payment of said principal, and all interest thereon may be enforced and recovered at once, anything to the contrary notwithstanding.'

The bill of sale or deed of transfer which was signed by the accountant and the purchasers contained a copy of the 'Inventory of the assets, stock and fixtures of Rockhill & Wilson, Nos. 603 and 605 Chestnut street, taken July 1, 1871,' in which the stock of ready-made clothing was estimated at $61,569; stock of uncut goods at $26,495 23; bills and accounts due the firm, $52,763 84; cash on hand, $8,439 90; fixtures, $2,500; making a total of,  . . . . . . . . . . . . . . . . . . $151,767 97
The liabilities were stated to be,  . . . . .    97,723 94

Leaving a surplus of . . . . . . . . . . .  $54,044 03
and the shares of the partners:
   Daniel H. Rockhill, one half,   $27,022 01
   Franklin S. Wilson,        "         27,022 02

The instrument further recited the agreement of Mr. Wilson to make the sale, the taking of the account of stock July 1, 1871, in pursuance of it, and the failure to consummate the sale in consequence of his death

Mrs. Wilson's approval was in writing at the foot of the paper: 'I approve of the above agreement,' signed, Agnes Wilson.

When the sale was thus made, the accountant was aware, as the decedent was when he agreed to make it, that the ability of the purchasers to pay depended upon their success in the business.  But apart from the fact of the contract and of the probability of an action for breach had he refused to carry it out, an unsettled interest in a partnership was a very difficult asset to realize upon.  A sale in the market would probably have been impracticable, except at a ruinous sacrifice, if, indeed, it could have been made at all; and there remained, therefore, only the tedious, expensive, and uncertain method of pro-

ceeding for an account with the surviving partner.  Such an account, it is probable from the evidence, would have resulted in the loss of the entire interest, with, perhaps, the additional loss of valuable assets held by creditors on collateral for loans to the firm as stated hereafter.  Mr. Allen, the senior member of the firm of Allen, Lane & Scott, who for many years had been the book-keeper and financial manager of Rockhill & Wilson, leaving them at the time of the Leisenring failure, in order to protect their interests by accepting the position of assignee for creditors, testified that from his knowledge of financial affairs at the time of the death of Mr. Wilson, he was of opinion that a forced closing out of the business would, by reason of the necessary sacrifice of the stock of ready-made clothing and the inability to made speedy collections of outstanding accounts, have resulted in the insolvency of the firm.

The fact that the decedent, with the full knowledge of the circumstances of the purchasers, had fixed the terms of purchase, furnished the most convincing proof that the sale was an advantageous one for the interests of his estate, while, in addition to this, the widow desired it, and her father, the grandfather of the only other distributee, advised that it should be made.   Under the circumstances, the auditing judge is clearly of opinion that the act of the accountant in consummating the sale was entirely proper.

The interest on the bond was punctually paid each half year to July, 1876.  A single instalment of principal, $5,000, was paid in August, 1874.   Payment was from time to time demanded by the accountant, but, except in the instance mentioned, he was always informed by Mr. Rockhill while he lived, (he being the financial member and chief manager of the firm,) that there were not the means with which to make it.   Whether under the terms of the instrument so long as the interest was regularly paid the entire principal could be called for when default was made in the payment of an instalment of principal, is far from clear ; but conceding that it could be, the only method of enforcing it would have been a levy upon the interest of the debtors in the firm, and from this nothing could have been realized until a settlement of accounts and a payment of firm liabilities.  A forced sale of the stock of the concern might for the reasons already mentioned, have resulted in the insolvency of the firm, and a consequent loss of the interest of the separate members. Mr. Rockhill was the father of Mrs. Wilson, and naturally interested in having everything secured for her that could

be, and the accountant had the right to place confidence in his representations with reference to the affairs of the firm.

There was another reason which made it necessary to proceed with great caution in compelling a closing up of the business. There were assets belonging to the separate estate of the decedent which had been pledged in his lifetime for the indebtedness of the firm. These assets were $10,000 Steubenville and Indiana bonds, $7,500 Preston Coal Company bonds, $5,000 West Pennsylvania bonds, amounting in all to $22,500. They were still held by the creditors of the firm, and for this reason had been valued by the appraisers of the decedent's estate at nothing, and if the firm should be driven to insolvency they would be lost altogether. By the course taken, they were all saved and their full value realized to the estate.

It was the expectation of Mr. Rockhill, and of Messrs. Raab, Thomas, and Purnell, and of business men generally, that trade would revive and that more prosperous times were at hand. The accountant was himself a merchant of many years' experience, and his judgment was that a resort to extreme measures would be dangerous, and that the safer course was to afford every chance to the debtors.

Mr. Rockhill died in July, 1876, having, by a codicil to his will, dated May 12, 1876, appointed the accountant and Israel H. Johnson his executors, and authorizing them to continue the business of Rockhill & Wilson. The fact of this appointment, and the entire confidence in the integrity and business capacity of the accountant thus indicated, shows that at least one most competent to judge must have considered the course taken with regard to the interests of the Wilson estate as proper and judicious.

According to the balance-sheet of December 31, 1876, the apparent assets of the firm amounted to $153,721 45, and the liabilities to $83,547 36, showing an apparent surplus of $70,174 09. Among these assets, however, were included a debt of J. B. Rockhill of $7,092. 33, real estate in Camden, $5,556 21, and sundry small accounts amounting to $22,000, all of which ultimately proved to be of no value. The stock of clothing on hand was estimated at $60,805 20, while, had it been sold in bulk or at auction, it would, according to the testimony, probably not have been sold for half that sum ; so that, after deducting the expense of liquidation, the amount left to represent the interest of Raab, Thomas and Purnell would have been lit-

[Wilson's Appeal.]

tle or nothing. As surviving partners, they had the right to the management and winding up of the business. They were still hopeful of ultimate success, though as yet they had paid but a single instalment of their debt, and had drawn out simply their living expenses, ($2,000 per annum each,) and they desired to continue in the business. They had many years' experience, and were skilful salesmen, thoroughly understanding how to dispose of the stock on hand in the most advantageous manner. They were still without means, except what stood to their credit on the books of the firm, and a levy on their interest would have produced nothing. It is true the accountant could have bought it in at sheriff's sale, and thus, as executor of Mr. Rockhill's estate and administrator of Mr. Wilson's estate, have had the entire control of the business; but by doing this he would have deprived both estates of the advantage to be had from their aid in the final winding up, and would have brought on a forced sale of the stock.

The hoped-for improvement in business never came. Each year affairs grew worse and worse. Expenses were curtailed and forces reduced, and finally, in March, 1880, judgment was entered on the warrant of attorney accompanying the bond of Messrs. Raab, Thomas, and Purnell, and a levy made on their interest, which was bought in by the accountant at five dollars, and not enough was afterwards realized from the sale of the assets to pay the debts of the firm.

The liability of the accountant depends, not upon his omission to demonstrate by levy and execution the worthlessness of the bond, nor upon the fact that in the light of subsequent events it might appear that the course taken was not the best one. The question is, did he act with reasonable prudence? Infallibility is not to be expected, and honest mistakes of judgment on the part of trustees are not punished by making them personally responsible for the consequences. In the absence of gross misconduct, or gross negligence, a trustee will not be surcharged with moneys which never came into his hands. (Chambersburg Saving Fund Association's Appeal, 26 Smith, 203 ; Neff's Appeal, 7 Smith, 91 ; Stern's Appeal, 14 Norris, 504.) The good faith of the accountant in the present case was conceded, and there is no evidence whatever of gross negligence. His experience as a business man had taught him that the solvency of a merchant did not rest simply upon the ownership of assets to an amount very considerably in excess of his liabilities, and that unless

they could be converted into cash as the obligations matured, there was a legal insolvency of which an actual insolvency would be the natural, if not the necessary, consequence. In all of the balance-sheets that were exhibited in evidence for the purpose of showing the solvency of the firm of Rockhill & Wilson, and the existence of a balance to the credit of Messrs. Raab, Thomas, and Purnell, the chief assets were the stock of clothing on hand estimated at cost, and the outstanding accounts due the firm. Both of these were very uncertain quantities, not at all to be relied on in case of emergency. Debtors might prove unable or unwilling to pay, and legal proceedings might be required to enforce payment after long delays, while a stock of ready-made clothing, consisting for the most part of articles remaining unsold at the end of the season, many of them of antiquated style and material, and all of them becoming daily of less value by reason of change of fashion, if forced into the market, could manifestly be sold only at prices far below their original cost, and the larger the stock, the greater necessarily would be the depreciation. So that, while for the purposes of this case the fact may be conceded to be otherwise, there is strong reason, under the evidence, to believe that had the affairs of the firm at any time after July, 1871, been brought to a forced settlement, little or nothing would have remained after the payment of the joint obligations, if, indeed, there would have been enough for even this purpose.

If, therefore, the question is to be regarded as still an open one, the exceptions must, in the opinion of the auditing judge, be overruled.

But is it an open one?

It has already been stated that a previous account was filed and duly adjudicated May 14, 1879. The account was a joint one, filed by the present accountant and his co-administrator, Mrs. Agnes Wilson. In it the accountants were charged with the appraised value of the bond taken for the interest of the decedent in the firm of Rockhill & Wilson, with the semi-annual payments of interest to July, 1876, and with the $5,000 paid on account of principal in August, 1874; and credit was taken for the balance remaining unpaid, at its appraised value, as an uncollected asset. Mrs. Wilson joined in the affidavit as to the justice of the account, both in matters of charge and discharge, and both she and William Devoo Wilson, who had become of age in the preceding June, participated, without a word of objection to anything in the account, in the distribution awarded. So far as Mrs.

[Wilson's Appeal.]

Wilson was concerned, she was already estopped, by her written approval of the sale at the time it was made, from afterwards questioning its propriety, and by her participation in and affidavit to the correctness of the account, from alleging that the credit claimed for the uncollected balance due on the bond was improper. The participation of William Devoo Wilson in the distribution closed his mouth as to the original transaction, while the decree confirming the account, and thus allowing the credit, and directing that the unconverted asset should be the subject of future account, precluded objection, except on the ground of fraud, as to the action of the accountants with regard to the bond during the period of the account and up to the date of the decree. If, up to that time, there had been any act of negligence which had made the accountants responsible, instead of being credited with the assets remaining in their hands as the subject of a future account, the proper decree would have been that they should be charged with the amount as cash then in their hands, and should make distribution accordingly. If there was error in the decree made, the remedy was by petition for review. Fraud is not pretended, and while the decree stands, nothing involved in it can be inquired into collaterally.

It is not alleged that, at any time after that adjudication, it would have been possible to have collected the debt."

The account was confirmed *nisi.* The following exceptions were filed on behalf of W. D. Wilson, viz:

*First.* The auditing judge erred in allowing the accountant the credit claimed by him in the account for $15,391 52, "balance of first account uncollectible."

*Second.* The auditing judge erred in refusing to surcharge the accountant with the sum of $15,391 52, the balance in his hands from first account.

*Third.* The auditing judge erred in refusing to surcharge the accountant with the sum of $15,391 52, as the value of the bond and warrant of attorney, given to him December 1, 1871, by J. Milton Raab *et al.*, for the purchase of the interest of Franklin S. Wilson, deceased, in the firm of Rockhill & Wilson.

These exceptions were dismissed by the court and the adjudication was confirmed in the following opinion by HANNA, P. J.:

"As is clearly shown by the auditing judge, the single question is, could accountant have collected the balance due upon the bond given upon the sale of decedent's in-

[Wilson's Appeal.]

terest in his firm at any time since the confirmation of the first account? It is conceded the bond has, ever since that time, been uncollectible. This being the case, we need only say that accountant is, beyond all question, properly entitled to the credit claimed in his account for the balance due on the bond as a "bad debt" of the estate. The exceptions are accordingly dismissed, and adjudication confirmed."

William Devoo Wilson thereupon took this appeal, assigning for error the action of the court in dismissing his exceptions, in allowing the accountant the credit claimed by him in the account for $15,391 52, "balance of first account uncollectible," in refusing to surcharge the accountant with the sum of $15,391 52, the balance in his hands from first account, and in refusing to surcharge the accountant with the sum of $15,391 52, as the value of the bond and warrant of attorney given to him December 1, 1871, by J. Milton Raab *et al.*, for the purchase of the interest of Franklin S. Wilson, deceased, in the firm of Rockhill & Wilson.

*Jerome Carty* and *Mayer Sulzberger* for appellant.

We object to the allowance of the credit on two grounds, viz:

*First.* That the accountant had no right to sell decedent's interest in a valuable business to irresponsible parties on credit and without security.

*Second.* That the loss arose from his neglect to enforce payment of the instalments from the debtors, from time to time, as they fell due.

If an administrator, instead of winding up the business of the testator, continues it, or involves the assets of the estate in the risk of mercantile adventure, the wisdom of his course is judged by the event, and if the result prove disastrous, he must stand the responsibility; Stern's Appeal, 14 Norris, 504; Wood's Estate, *supra;* De Haven's Estate, 39 Leg. Int., 450; Labouchere *v.* Tupper, 11 Moore, P. C., 198; 3 Williams on Executors, 6 Am. Ed., 1890.

But it is claimed by the accountants, and so ruled by the orphans' court, that the appellant is precluded by the adjudication and confirmation of the first account from showing negligence on their part in failing, prior to that time, to collect the bond.

And that the only question open for consideration is whether the bond could have been collected after May 14, 1879, the date of the decree.

In this it is submitted there was error.

[Wilson's Appeal.]

There are three elements universally necessary to constitute an estoppel by judgment:

*First*. The judgment must have been valid, that is, not void.

*Second*. It must have been rendered on the merits.

*Third*. It must have been final: Bigelow on Estoppel, 2d Ed., 25.

Where the real merits of the present action have not been at all inquired into in a former proceeding, issue may be taken on the fact, if the judgment be pleaded in bar: Starkie on Evidence, page 334, *et notæ*.

An examination of the adjudication on the first account shows that there was no judgment upon the matter in controversy here.

The administrators, to balance their account, stated on the credit side of it, that they had, in their hands, uncollected, the bond, the balance of the appraised value of which was $15,391 52. The court adjudicated that this balance should be the subject of a further account.

A decree in the orphans' court, confirming one account, is conclusive only as to the funds then distributed, and does not bind the court when another account in the same estate comes before it for adjudication: Guenther's Appeal, 4 W. N. C., 41; Kline's Appeal, 86 Pa., 363.

*R. C. Dale*, *Samuel Dickson*, and *J. C. Bullitt* for appellee.

It is submitted that the sale was judicious, that nothing could have been realized at that time from a hostile winding up of the business; that, besides destroying any chance of realizing anything from the right title and interest of the decedent, there was every reason to apprehend that the firm assets would not pay the debts, and the securities of the decedent already pledged would have been sacrificed; so that instead of realizing $97,187 48 *net* out of assets appraised at $82,447 68, much less than the appraisement would have been secured. The widow, by the approval of the sale, and the son, by his acceptance of his share of the portion of the purchase money actually received, ratified the sale of the interest, and both are now estopped from disputing the propriety of the original transaction.

April 7th, 1884.—Per Curiam : The sale made by the administrator was in good faith, and in fulfillment of an arrangement made by the intestate in his life time. We think the sale a very judicious one. The whole evidence

impresses us with the conviction that the administrator was not guilty of such negligence in failing to collect the sum agreed to be paid, as to make him personally liable. He appears to have exercised a just and wise discretion; and to have realized as much for the estate as could have been done by any course he might have pursued. The widow of the decedent approved of the sale, and the appellant ratified it by receiving his share of the purchase money. There is no error in the decree.

Decree affirmed, and the appeal dismissed at the costs of the appellant.